917 F.2d 885
 1991 A.M.C. 894
 Ernest D. SHARP, Plaintiff-Appellant,
Wausau Insurance Companies--Part I, Intervenor-Appellant,
v.
JOHNSON BROTHERS CORP., St. Paul Fire & Marine Insurance
Company, Centennial Insurance Co. and Employers of
Wausau Ins. Co.--Part II, Defendants-Appellees,
JOHNSON BROS. CORPORATION and St. Paul Fire & Marine Ins.
Co., Defendants-Appellees.
v.
CENTENNIAL INSURANCE COMPANY, Defendant-Appellee.
 No. 89-3764.
 United States Court of Appeals,
Fifth Circuit.
 Nov. 21, 1990.
 
 Kevin A. Galatas, New Orleans, La., for Sharp.
 Joseph B. Guilbeau, Dean A. Sutherland, Sutherland & Juge, New Orleans, La., for Wausau Ins.-Part I.
 Michael J. Maginnis, Timothy P. Hurley, McGlinchey, Stafford, Mintz, Cellini & Lang, New Orleans, La., for Johnson Bros. and St. Paul Fire & Marine Ins. Co.
 Robert B. Acomb, Jr., Richard D. Bertram, Jones, Walker, Waechter, Poitevent, Carrere & Denegre, New Orleans, La., for Centennial Ins. Co.
 Elizabeth H. Ryan, Wood Brown, III, Montgomery, Barnett, Brown, Read, Hammond & Mintz, New Orleans, La., for Employers of Wausau-Part II.
 Daniels Knowles, III, Wm. Daniel Wellons, Burke & Mayer, New Orleans, La., for St. Paul Fire & Marine Ins. Co.
 Appeals from the United States District Court for the Eastern District of Louisiana.
 Before GEE and DAVIS, Circuit Judges, and SMITH[1], District Judge.
 W. EUGENE DAVIS, Circuit Judge:
 
 
 1
 Plaintiff Ernest D. Sharp appeals a directed verdict for Defendant Johnson Brothers Corporation (Johnson) rejecting Sharp's suit on the ground that he was not a seaman. 719 F.Supp. 516. Additionally, Johnson, Wausau Insurance Companies (Wausau), and St. Paul Fire & Marine Insurance Company (St. Paul) appeal a summary judgment granted to Centennial Insurance Company (Centennial) exonerating Centennial from paying Johnson's litigation costs. We reverse both rulings and remand for further proceedings.
 
 I.
 
 2
 Johnson is a heavy construction company specializing in bridge and dock building. During the fall of 1985, Johnson began rebuilding Southern Railroad Company's train bridge which spans Lake Pontchartrain. The project required Johnson to drive piles for the erection of piers to support the new bridge. Johnson bareboat chartered a group of vessels to assist in the project--the tug M/V FERDIE CANDIES and four deck barges, the CMS-206, JG-204, CMS-424, and CMS-575. Johnson installed cranes on the two spud barges, CMS-206 and JG-204. The company used the CMS-206 for pile driving and the JG-204 for moving, digging, loading, and unloading. The CMS-424 and the CMS-575 barges were ordinary flat deck barges. Workers used these two barges for transporting and storing materials and as work areas during pile-driving operations.
 
 
 3
 Johnson hired Sharp in June 1985 as a welder/pile driver on the Pontchartrain project. Sharp was the leaderman of the pile-driving crew. Johnson is, however, a non-union employer which has no formal job classes; each of its workers performed a variety of tasks. Sharp lived ashore. Johnson transported its workers to and from the jobsite each day by boat.
 
 
 4
 During the first six months of the bridge project, most of the work involved pile-driving operations. Workers frequently moved the barges around the jobsite throughout the day. After the crew finished driving a piling, the M/V FERDIE CANDIES moved the flotilla of barges to the position of the next piling. At least once and sometimes twice a week early in the project, the pile-driving crew accompanied the M/V FERDIE CANDIES, crane barge JG-204, and one of the material barges on a five-mile round trip across a portion of Lake Pontchartrain. On these trips, the crew transported equipment and supplies to the jobsite. Whenever a hurricane threatened, which occurred four times in 1985, the crew moved the entire flotilla out of the Lake to a safe harbor on Bayou Liberty.
 
 
 5
 One day in late November 1985, the pile-driving crew took the M/V FERDIE CANDIES to the east side of the trestle to retrieve some materials located aboard the JG-204. The crew used the crane mounted on the JG-204 to transfer angle iron from the barge to the tug. Sharp, meanwhile, loaded small tools onto the tug. During this operation, the crane dropped a load of the angle iron on Sharp, who was standing on the bow of the M/V FERDIE CANDIES. This litigation followed.
 
 
 6
 When Johnson bareboat chartered the JG-204 from Central Marine Service (Central), Central's insurer, Centennial, designated Johnson as an additional insured in the barge's protection and indemnity policy. Johnson acquired excess coverage on the M/V FERDIE CANDIES and the JG-204 from St. Paul. When Sharp filed suit, Johnson called upon Centennial to provide a defense. Centennial refused. St. Paul then agreed to defend Johnson as the excess insurer with the understanding that St. Paul would seek reimbursement from the primary insurer, Centennial. St. Paul asserted a cross-claim against Centennial to recover Johnson's defense costs.
 
 
 7
 The trial court severed the seaman status issue from the remaining issues in the case. After three days of testimony, the court granted the defendants' motions for a directed verdict on grounds that the evidence was insufficient to support a finding that Sharp was a seaman. The court concluded that the evidence would not support a finding that the barges were vessels because their use in transportation was merely incidental to their primary use as work platforms. In any case, reasoned the court, Sharp was a Pizzitolo[2] longshoreman and therefore could not bring a Jones Act claim. Sharp argues on appeal that the barges' transportation function was not merely incidental and that Pizzitolo does not apply.
 
 
 8
 The trial court also granted Centennial's summary judgment motion. The court concluded that Centennial did not owe Johnson or St. Paul reimbursement for defense costs. The court reasoned that Johnson did not incur defense expenses because St. Paul paid for Johnson's defense. Johnson and St. Paul argue on appeal that Centennial owes St. Paul for the defense costs as Johnson's subrogee.
 
 II.
 
 9
 To qualify as a seaman under the Jones Act, an injured maritime worker must establish that he was permanently assigned to or performed a substantial portion of his work aboard a vessel or fleet of vessels. Barrett v. Chevron, U.S.A., Inc., 781 F.2d 1067, 1074 (5th Cir.1986); Offshore Co. v. Robison, 266 F.2d 769, 779 (5th Cir.1959). The district court concluded that none of the barges on which Sharp worked were vessels; thus, a reasonable juror could not find that Sharp was a seaman.
 
 
 10
 Our cases illustrate clearly "that the question of seaman status should only be removed from the trier of fact (by summary judgment or directed verdict) in rare circumstances and that even marginal Jones Act claims should be submitted to the jury." Bernard v. Binnings Constr. Co., 741 F.2d 824, 827 (5th Cir.1984). The trial court should direct a verdict only "if the facts and inferences point so strongly and overwhelmingly in favor of one party that the court believes that reasonable men could not arrive at a contrary verdict." Boeing Co. v. Shipman, 411 F.2d 365, 374 (5th Cir.1969). We must decide whether the district court properly concluded from the evidence presented that the barges to which Sharp was assigned were, as a matter of law, work platforms and not vessels.
 
 
 11
 We have held consistently "that dry docks and analogous structures whose primary purpose is to provide a work platform, even if the structures are afloat, are not Jones Act vessels as a matter of law." Bernard, 741 F.2d at 830. In determining whether a structure is a "work platform," we consider whether:
 
 
 12
 1) The structures involved were constructed and used primarily as work platforms;
 
 
 13
 2) They were moored or otherwise secured at the time of the accident; and
 
 
 14
 3) Although they were capable of moving and were sometimes moved across navigable waters in the course of normal operations, any transportation function they performed was merely incidental to their primary purpose of serving as work platforms.
 
 
 15
 See id. at 831; cf. Ducrepont v. Baton Rouge Marine Enters., 877 F.2d 393 (5th Cir.1989) (Bernard factors are not minimum criteria but only criteria common to structures previously found not to be vessels; therefore, structure can be work platform without meeting all the factors).
 
 
 16
 There is little dispute between the parties over the first two Bernard factors. None of the barges was designed as a work platform. Rather, they were ordinary flat deck barges built to transport cargo on water. The two spud barges had raked bows, and the cargo barges had raked bows and sterns. The barges were officially registered and equipped with bilge pumps and navigational lights. The existence of these features suggests that the barges were constructed primarily for transportation across navigable waters. See Bernard, 741 F.2d at 832 n. 25. Barge JG-204, which carried the crane used for loading, was spudded at the time of the accident. Johnson, however, frequently moved this barge around the jobsite.
 
 
 17
 The parties devote most of their attention to the third Bernard factor: whether the barges' transportation function was incidental to their work platform function. Brunet v. Boh Bros. Construction Co., Inc. is the most analogous case dealing with this factor, 715 F.2d 196 (5th Cir.1983). Brunet was injured aboard a barge which supported a pile-driving crane. Id. at 197. Because the barge was not self-propelled, tugboats moved it to and from the jobsite. Id. Although the barge was moored at the jobsite when the accident occurred, the construction company moved the vessel to four different sites in the six months preceding the accident. Id. at 199. We acknowledged that the barge was used more often to support the crane than to transport it; yet, we determined that the transportation function was not "so 'incidental' as to warrant a conclusion that the barge was not a vessel as a matter of law." Id. at 198.
 
 
 18
 Among the barges in the Johnson fleet, the pile-driving Barge CMS-206 had the least significant transportation function. The movement of the CMS-206, however, was more extensive than the Brunet barge. Both barges were used to transport pile-driving cranes to and around jobsites. In both cases, the construction companies moved the barges away from the jobsite several times in the months preceding the accident. We conclude that the jury in this case, as in Brunet, was entitled to find that the CMS-206's transportation function was not merely incidental to its work platform function.
 
 
 19
 Because the other three barges were moved more frequently than the CMS-206 to transport materials, equipment, and supplies, the jury was entitled to find that they too had more than an incidental transportation function. The tug, the JG-204, and one of the material barges were taken to shore at least once and sometimes twice a week to pick up supplies early in the project. All the barges were moved out of the Lake to Bayou Liberty four times in the months before the accident. Michael Chadwick, a former Johnson employee, testified that early in the project the crew spent three to four hours a day moving the barges around the jobsite. Chadwick also testified that at the end of the shift the material barges were anchored out on the Lake away from the trestle. The crew had to retrieve the anchored barges at the beginning of the next shift. Johnson used the material barges to haul gravel to the site. This extensive movement would support a jury finding that the Johnson barges' transportation function was more than incidental.
 
 
 20
 Defendants rely on our Ducrepont decision. In Ducrepont, we affirmed the district court's conclusion that the barge at issue was not a vessel. 877 F.2d at 395. The Ducrepont structure was a cargo barge used to repair and clean other barges. It usually was moored to the shore by wires and occasionally moved a short distance from shore as required by water level changes. Ducrepont was injured on the barge while it was moored. Id. at 394. The Ducrepont barge was affixed almost permanently to the shore; it performed its function without regular movement. The facts of this case are more closely aligned with Brunet than with Ducrepont. The Johnson barges and those at issue in Brunet were moved much more extensively than the barge in Ducrepont.
 
 
 21
 The trial judge also found that even if the barges were vessels, Sharp did not shoulder his burden of producing evidence from which a jury could conclude on which particular barge he performed substantial work. Because we have concluded that the jury was entitled to find that all the barges in the Johnson fleet were vessels, such precision is not required. Jack Anderson, a Johnson employee, testified that Sharp spent 80% of his time on the barges. Chadwick stated that Sharp was on the barges 85 to 90% of the time. The jury was entitled to conclude that Sharp did a substantial portion of his work aboard a fleet of vessels. This finding would support a determination that Sharp was a seaman. See Barrett v. Chevron, U.S.A., Inc., 781 F.2d 1067, 1074 (5th Cir.1986).
 
 
 22
 Finally the defendants argue that we can affirm the directed verdict on the alternate ground that Pizzitolo, 812 F.2d 977, precluded a jury finding of seaman status. Because Sharp was not engaged in an occupation enumerated in the Longshore & Harbor Workers' Compensation Act, reliance on Pizzitolo is misplaced. See Thibodeaux v. Torch, Inc., 858 F.2d 1048, 1051 (5th Cir.1988); Leonard v. Dixie Well Serv. & Supply, 828 F.2d 291 (5th Cir.1987). In sum, we conclude that a jury was entitled to conclude from the evidence that Sharp was a seaman.
 
 III.
 
 23
 Sharp argues that the district court erred in excluding evidence about the movement of the barges after the completion of the Pontchartrain project. In Brunet, we noted that the barge at issue had been "moved to four different jobsites within the Gulf Area in the six months preceding the accident." 715 F.2d at 199. We obviously considered the transportation function of a barge in moving from job to job a relevant consideration in determining whether the barge was a work platform. Assuming that Johnson used the barges in generally the same manner after the accident, the trial court should allow Sharp some latitude on remand in demonstrating how Johnson used the barges for a reasonable time after the accident.IV.
 
 
 24
 Johnson and St. Paul challenge the district court's summary judgment in favor of Centennial. The Centennial Protection and Indemnity policy requires it to reimburse its insured, Johnson, for defense costs which Johnson "shall pay."[3] Because the defense costs were paid by St. Paul, the district court exonerated Centennial on the ground that Johnson "paid" no defense costs.
 
 
 25
 When St. Paul makes payments on Johnson's account, St. Paul's policy subrogates it to Johnson's rights. This places St. Paul in Johnson's shoes to recover the defense costs St. Paul paid. See Continental Casualty Co. v. Canadian Universal Ins. Co., 605 F.2d 1340, 1345 (5th Cir.1979), cert. denied, 445 U.S. 929, 100 S.Ct. 1317, 63 L.Ed.2d 762 (1980). Under these circumstances, St. Paul need not demonstrate that Johnson paid the defense costs; it is enough that Johnson's subrogee paid those costs.[4]
 
 
 26
 REVERSED and REMANDED.
 
 
 
 [1]
 District Judge of the Western District of Texas, sitting by designation
 
 
 [2]
 Pizzitolo v. Electro Coal Transfer, 812 F.2d 977 (5th Cir.1987), cert. denied, 484 U.S. 1059, 108 S.Ct. 1013, 98 L.Ed.2d 978 (1988)
 
 
 [3]
 The Centennial policy provides in pertinent part:
 The Assurer hereby undertakes to make good to the Assured or the Assured's executors, administrators and/or successors, all such loss and/or damage and/or expense as the Assured shall as owners of the vessel named herein have become liable to pay and shall pay on account of the liabilities, risks, events and/or happenings herein set forth....
 
 
 [4]
 Centennial may be able to require St. Paul to share these expenses as a co-insurer. The district court did not reach this issue, and we express no opinion on it