REVISED, March 9, 1998

**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

_____

No. 97-30008
_____


ARABIE J. MANUEL,

Plaintiff-Appellant,

VERSUS


P.A.W. DRILLING & WELL SERVICE, INC.;
WESTWOOD INSURANCE COMPANY, LTD.,

Defendants-Appellees.

_____

Appeal from the United States District Court
For the Eastern District of Louisiana
_____
March 2, 1998

Before JOLLY, DAVIS, and BARKSDALE, Circuit Judges.

W. EUGENE DAVIS, Circuit Judge:

Arabie J. Manuel appeals the district court's grant of summary judgment to his employer, P.A.W. Drilling & Well Service, Inc., and its insurer dismissing Manuel's action on the ground that he was not a seaman because the barge upon which he worked was not a vessel.  We reverse, render, and remand.

I.

Arabie Manuel began his employment with P.A.W. Drilling & Well Service, Inc. ("P.A.W.") in June of 1995, approximately two months before his alleged injury.  Manuel worked during these two months as a floorhand on a workover rig identified as "Rig 3."  Rig 3 consisted of a portable truck-mounted workover rig owned by P.A.W.

that was driven onto the deck of a leased barge and bolted into place. The summary judgment evidence established that the workover rig had been bolted to this particular barge for more than two years. The leased flat-deck barge was equipped with spuds used to secure the barge to the water bottom once it reached the worksite.

Rig 3 had no motor power and was moved by tugboat from location to location. The barge itself did not contain any steering mechanisms, navigational devices, bilge pumps, or crew quarters, except for a small shed in which the crew changed clothes. The barge had a keyway in its stern to allow the barge to be positioned over the wellhead. As a workover rig, Rig 3 was equipped with essentially the same type of equipment as a drilling rig. This included a derrick with traveling block, a drawworks-type winch to run the traveling block up and down the derrick, a driller's console, a mud pump and mud tank, a cement unit for pumping cement into wells, and a crane. P.A.W. used Rig 3 primarily to plug and abandon wells.

Rig 3's crew consisted of four men: a toolpusher, a driller, and two floorhands. The crew did not live aboard Rig 3. Each morning, a small boat picked up the crew at a dock and transported them to wherever Rig 3 was located. Upon arriving on Rig 3, the crew would raise the derrick and anchor the barge by dropping the spuds. Each evening, the transport boat would return the men to land, where they slept in lodgings provided by P.A.W. The crew usually did not remain on Rig 3 while it was under tow to a different location.

In the two years before August of 1995, Rig 3 worked at 19

different locations, all over water. It performed work on 63 different wellheads.[1] Work on each wellhead lasted anywhere from one day to thirty-five days. In the two months from June to August of 1995 that Manuel spent working for P.A.W., Rig 3 worked on several sites near Avery Island, Amelia, and Cut Off, Louisiana. On August 6, 1995, Rig 3 was performing a plug and abandon job on a well near Cut Off, Louisiana. The crew was running production tubing in and out of the well to pump cement and mud into the well. Manuel allegedly hurt his back when he and a co-worker, Lionel Leblanc, attempted to pick up a joint of tubing that had fallen from the barge.

In November of 1995, Manuel filed suit against P.A.W. and its insurer under the Jones Act, 46 App. U.S.C. § 688, and the general maritime law to recover for his injuries. Manuel alleged that he was a member of the crew of Rig 3. Both Manuel and P.A.W. filed motions for summary judgment addressing Manuel's status as a seaman. P.A.W. argued that Rig 3 was not a vessel as a matter of law, and, therefore, Manuel's Jones Act claim failed because he could not establish that he was assigned to a vessel in navigation. The district court granted summary judgment in favor of P.A.W. and dismissed all of Manuel's claims. This appeal followed.

II.

A.

We review the district court's grant of summary judgment *de novo*. Pavone v. Mississippi Riverboat Amusement Corp., 52 F.3d

---

[1] Several of these locations had multiple wellheads. Rig 3 was either towed, or, if the wellheads were located close together, maneuvered over each wellhead to perform its work.

3

560, 565 (5th Cir. 1995). We determine whether all of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). We view this evidence and the inferences to be drawn from it in the light most favorable to the nonmovant. Pavone, 52 F.3d at 565.

## B.

To recover as a seaman under the Jones Act, a plaintiff must demonstrate an "employment-related connection to a vessel in navigation." Chandris Inc. v. Latsis, 515 U.S. 347, 368-72, 115 S. Ct. 2172 (1995). This "employment-related connection" has two basic elements: First, an employee's duties must contribute to the function of the vessel or to the accomplishment of its mission. Second, the connection to the vessel in navigation must be substantial in terms of both its duration and its nature. Chandris, 515 U.S. at 368-69. Obviously, the existence of a vessel to which the employee is connected is a fundamental prerequisite to a Jones Act claim. Burchett v. Cargill, Inc., 48 F.3d 173, 176 (5th Cir. 1995). The sole issues in this appeal are whether the district court correctly concluded, as a matter of law, that Rig 3 was not a vessel and, therefore, that Manuel was not a seaman.

## C.

A "vessel" traditionally refers to structures designed or utilized for "transportation of passengers, cargo or equipment from place to place across navigable waters." Cook v. Belden Concrete

4

_Prods._, 472 F.2d 999, 1002 (5th Cir. 1973); see also _Bernard v. Binnings Constr. Co., Inc._, 741 F.2d 824, 828-29 (5th Cir. 1984); 1B BENEDICT ON ADMIRALTY § 11a, at 2-7 (7th ed. rev. 1996); GRANT GILMORE & CHARLES L. BLACK, JR., THE LAW OF ADMIRALTY § 1-11, at 33 (2d ed. 1975). This is consistent with the statutory definition which defines the word "vessel" as including "every description of watercraft or other artificial contrivance used, or capable of being used, as a means of transportation on water." 1 U.S.C. § 3. The determination of whether a given craft is a vessel is ordinarily resolved as a matter of law. Our cases have recognized, however, that at the margin, fact issues may be presented. See _Ducote v. V. Keeler & Co., Inc._, 953 F.2d 1000, 1002 (5th Cir. 1992) ("marginal claims are properly left for jury determination"); _Gremillion v. Gulf Coast Catering Co._, 904 F.2d 290, 292 (5th Cir. 1990); _Bernard_, 741 F.2d at 829.

In evaluating whether a structure is a vessel, we begin by examining "the purpose for which the craft is constructed and the business in which it is engaged." _The Robert W. Parsons_, 191 U.S. 17, 30, 24 S. Ct. 8, 12 (1903); see also _Burchett_, 48 F.3d at 176. In applying this test, two divergent lines of cases have emerged. In one line of cases, we have concluded that special purpose structures such as jack-up rigs, mobile, submersible drilling barges, derrick barges, spud barges, and others are vessels as a matter of law, even though they also served, in part, as work platforms.[2] Conversely, in the second line of cases, we have held

---

[2] See, e.g., _Mouton v. Tug "Ironworker"_, 811 F.2d 946 (5th Cir. 1987); _Guidry v. Continental Oil Co._, 640 F.2d 523 (5th Cir. 1981); _Hicks v. Ocean Drilling and Exploration Co._, 512 F.2d 817

that a variety of structures utilized predominately as work platforms are not vessels.[3]

1.

In a long line of cases, we have held a variety of special purpose structures, far removed from the conventional notion of ships and seagoing barges, to be vessels.[4] As previously stated, "unconventional craft [such] as submersible drilling barges and floating dredges which are designed for navigation and commerce are vessels within general maritime and Jones Act jurisdiction and retain such status even while moored, dry-docked, or otherwise immobilized and secured to land." Cook, 472 F.2d at 1001. A review of the development of this line of cases follows.

The seminal case of Offshore Co. v. Robison, 266 F.2d 769 (1959), addressed whether workers attached to "special purpose structures" used in the oil and gas industry were "seamen" under the Jones Act. The structure at issue was a drilling rig mounted on a mobile drilling barge. The barge was towed from location to location and was equipped with retractable legs which could be lowered to the ocean floor in order to lift the barge above the water to serve as a platform from which drilling operations were

---

(5th Cir. 1975); Producers Drilling Co. v. Gray, 361 F.2d 432 (5th Cir. 1966).

[3] See, e.g., Pavone v. Mississippi Riverboat Amusement Corp., 52 F.3d 560 (5th Cir. 1995); Burchett v. Cargill, Inc., 48 F.3d 173 (5th Cir. 1995); Watkins v. Pentzien, Inc., 660 F.2d 604 (5th Cir. 1981).

[4] See Colomb v. Texaco, Inc., 736 F.2d 218 (5th Cir. 1984); Hicks v. Ocean Drilling and Exploration Co., 512 F.2d 817 (5th Cir. 1975); Producers Drilling Co. v. Gray, 361 F.2d 432 (5th Cir. 1966); Offshore Co. v. Robison, 266 F.2d 769 (1959).

6

conducted.  The court held that the term "vessel" had a "wide range of meaning" under the Jones Act, and, therefore, genuine issues of fact existed regarding whether the drilling barge qualified as a "vessel."  Id. at 779-80.

In Producers Drilling Co. v. Gray, 361 F.2d 432 (5th Cir. 1966), the plaintiff was injured while working on a submersible drilling barge.  This barge, equipped with all of its drilling equipment and supplies, was towed from one location to another.  Once at the drilling site, the barge was submerged to the bottom of the body of water to conduct its drilling operation, and then refloated to be moved to another location.  The court concluded that the barge was a vessel as a matter of law.  Id. at 437.  Since Producers Drilling, this Court has generally held that special purpose drilling craft are vessels as a matter of law.[5]

The same analysis has been applied to other types of special purpose craft.  In Brunet v. Boh Bros. Constr. Co., Inc., 715 F.2d 196 (5th Cir. 1983), the plaintiff was injured on a barge that consisted of several interlocking flexi-float platforms that carried a crane to drive pilings.  The barge was moored by cable to pilings at the time of the accident.  The court overturned the district court's grant of summary judgment in favor of the defendant, finding that the "barge by necessity is designed to transport a pile-driving crane across navigable waters to jobsites that cannot be reached by land-based pile-drivers."  Id. at 198.

---

[5] See, e.g., Colomb v. Texaco, Inc., 736 F.2d 218 (5th Cir. 1984) (collecting cases); Guidry v. Continental Oil Co., 640 F.2d 523 (5th Cir. 1981); Hicks v. Ocean Drilling and Exploration Co., 512 F.2d 817 (5th Cir. 1975).

7

Mobility over navigable waters was one of the barge's features and the barge lacked the "Cook similarity to dry docks or construction platforms." Id. The barge was designed *both* to support the crane *and* to transport it on a fairly regular basis from one jobsite to another. Id. at 198-99. Thus, the court concluded that the transportation function was not so incidental as to "warrant a conclusion that the barge was not a vessel as a matter of law." Id.; see also Sharp v. Johnson Bros. Corp., 917 F.2d 885 (5th Cir. 1990) (reversing summary judgment because fleet of barges had more than incidental transportation function).

The above cases are typical of the numerous "special purpose vessel" cases this Circuit has decided. They exhibit a common theme: Despite the outward appearance of the structure at issue, if a primary purpose of the craft is to transport passengers, cargo, or equipment from place to place across navigable waters, then that structure is a vessel.[6] In the special purpose craft cases, particularly the drilling barge cases, the transportation function of the structure was more than merely incidental to its purpose. Each craft used as a work platform when its crew drilled for oil and gas. However, before the crew could drill, the barge was used to transport its specialized drilling equipment over water to the drilling site.

---

[6] See Michel v. Total Transp., Inc., 957 F.2d 186 (5th Cir. 1992); Ducote v. V. Keeler & Co., Inc., 953 F.2d 1000 (5th Cir. 1992) (*planned* extensive movement a factor that would support jury's finding of vessel status); Vickers v. Chiles Drilling Co., 822 F.2d 535 (5th Cir. 1987); Mouton v. Tug "Ironworker", 811 F.2d 946 (5th Cir. 1987); Colomb v. Texaco, Inc., 736 F.2d 218 (5th Cir. 1984); Burks v. American River Transp. Co., 679 F.2d 69 (5th Cir. Unit A 1982).

8

2.

Another line of cases developed in this Circuit concludes that certain structures that float upon the water are not vessels. The clearest examples of such floating craft that do not qualify as vessels are dry docks and similar structures that maritime law has never considered, at least while secured to land, to be vessels. Cook v. Belden Concrete Prods., Inc., 472 F.2d 999, 1000-01 (5th Cir. 1973); see also Atkins v. Greenville Shipbuilding Corp., 411 F.2d 279 (5th Cir. 1969). In Cook, the structure at issue was a large flat-deck barge upon which the defendant's employees fabricated concrete barges. The barge was secured to the defendant's dock and had the effect of extending the dock's work area. The barge was moved infrequently, primarily to launch the newly constructed concrete barges. This Court, relying on the Supreme Court's decision in Cope v. Vallette Dry Dock Co., 119 U.S. 625, 7 S. Ct. 336 (1887), concluded that the barge was a construction platform not designed for the transportation of passengers, cargo, or equipment across navigable waters, and that "the status of the craft [was] governed by the proposition that, 'as a matter of law, a floating dry dock is not a vessel when it is moored and in use as a dry dock.'" Id. at 1002 (citations omitted). The barge in question was merely an extension of the dock. See also Watkins v. Pentzien, Inc., 660 F.2d 604 (5th Cir. 1981) (holding that two barges fastened together, moored to bank of river, and used to weld pipeline together were not vessels); Leonard v. Exxon Corp., 581 F.2d 522 (5th Cir. 1978) (holding that platform consisting of four flat-deck barges moored to banks of

9

Mississippi River "more or less permanently" by steel cables was not a vessel).

Bernard v. Binnings Constr. Co., Inc., 741 F.2d 824 (5th Cir. 1984), addressed the question of whether a "work punt" which the plaintiff used to guide sheet pilings to construct a flood wall qualified as a vessel.  The work punt was a floating iron platform measuring sixteen feet long and four feet wide with a tank in the middle and at each end for buoyancy.  The parties stipulated that the work punt was "used solely as a small platform from which to break the cement and guide the sheet pilings" while men on the shore lowered the sheet pilings into position.  Id. at 826.  The plaintiff paddled short distances to get the work punt into position.  At the time of his injury, the plaintiff was standing with one foot on the work punt and one foot on a brace connecting two pilings.  Id. at 826.  Synthesizing the line of cases in our Circuit that developed in the wake of Cook, the court stated that

> [a] review of these decisions indicates three factors common to them:  (1) the structures involved were constructed and used primarily as work platforms; (2) they were moored or otherwise secured at the time of the accident; and (3) although they were capable of movement and were sometimes moved across navigable waters in the course of normal operations, any transportation function they performed was merely incidental to their primary purpose of serving as work platforms.

Id. at 831.  From this, the court concluded that the work punt was not a vessel because it was not designed for navigation and it did not have any significant transportation function.  Id. at 832.

Several of our cases have followed this reasoning.  See, e.g., Gremillion v. Gulf Coast Catering Co., 904 F.2d 290 (5th Cir. 1990) (holding that shoreside quarterboat barge serving as floating hotel

10

was not a vessel); <u>Daniel v. Ergon, Inc.</u>, 892 F.2d 403 (5th Cir. 1990) (holding that floating barge moored to shore, remaining in same place for approximately seven years, and used as work platform to clean and strip cargo and gas from barges was not a vessel); <u>Ducrepont v. Baton Rouge Marine Enters., Inc.</u>, 877 F.2d 393 (5th Cir. 1989) (holding that barge moored to the shore and used as a stationary work platform to clean other barges was not a vessel).

P.A.W. argues that our decision in <u>Ellender v. Kiva Constr. & Eng'g., Inc.</u>, 909 F.2d 803 (5th Cir. 1990), controls, and leads to the conclusion that Rig 3 was a work platform and not a vessel. In <u>Ellender</u>, the plaintiff was assigned to a job constructing an offshore platform containing oil production equipment, tanks, and adjacent flow lines. A flotilla of four barges was engaged in this work, including a spud barge and three other general purpose barges tied to the spud barge. Once in position, Kiva anchored the flotilla of barges by lowering the spuds on the spud barge. The spud barge was equipped with a crane that was used to drive pilings to construct the platform. Tugs moved the barges several feet on occasion to reposition them in order to drive a new set of pilings. The plaintiff was injured while working on the spud barge.

The court concluded that "the four-barge platform assembly which included the ATHENA 3 [the spud barge] clearly was not a Jones Act vessel at the time that [the plaintiff] suffered his accident." <u>Ellender</u>, 909 F.2d at 807. The structure was built "primarily to serve as a work platform." <u>Id.</u> The court found that any transportation function was incidental to its use as a work

11

platform.  Id.[7]

We conclude our discussion of the work platform cases by recalling their origin.[8]  In Cook, we held that the work platform was analogous to a dry dock.  The work platform, like the dry dock, is considered an extension of land.  Carrying "passengers, cargo, or equipment" from place to place across navigable waters is not central to its purpose so that it is not routinely exposed to the hazards of such travel.

                              D.

With this background, we now consider what conclusions can properly be drawn from the above cases.  We start from the bedrock premise that in determining what is a vessel, we ask what is the "purpose for which the craft is constructed and the business in which it is engaged."  The Robert W. Parsons, 191 U.S. 17, 30, 24

---

[7]  The court's conclusion that the flotilla's transportation function was merely incidental to its work was driven by two factors.  First, the job constructing the platform was the single assignment for this flotilla.  The flotilla did not travel from location to location as Rig 3 was assigned to do.
    Second, we infer from the facts stated in the opinion that the job was relatively close to shore and an insignificant amount of the flotilla's time was devoted to movement of the equipment and materials to the jobsite.  The flotilla was engaged almost exclusively in performing construction work.

[8]  We must also note that many of our work platform cases were decided before the Supreme Court's decision in Southwest Marine, Inc. v. Gizoni, 502 U.S. 81, 112 S. Ct. 486 (1991), where the Court concluded that genuine issues of material fact existed "regarding whether the floating platforms [upon which plaintiff worked] were vessels in navigation" and whether the plaintiff had a sufficient connection to these platforms to qualify as a seaman.  Id. at 494.  The floating platforms consisted of a pontoon barge, two float barges, a rail barge, a diver's barge, and a crane barge.  None of the barges had means of steering, navigation lights or aids, living facilities, or motor power.  The barges were moved around the shipyard by tugboat and were used to transport equipment, materials, supplies, and vessel components around the shipyard and on to and off of the vessels under repair.  Id. at 489.

S. Ct. 8, 12 (1903).  If the owner constructs or assembles a craft for the purpose of transporting passengers, cargo, or equipment across navigable waters and the craft is engaged in that service, that structure is a vessel.   In many cases, the purpose for which the craft is constructed or assembled can be inferred from the use to which the craft is put by the owner.  For example, in the case at hand, P.A.W. assembled Rig 3 for the purpose of transporting the workover rig across navigable waters to plug and abandon wells located in various sites on navigable waters.  In the occasional case where the intended purpose of the craft is not clear, our cases have recognized that other factors may be relevant.  These include the intention of the owner to move the structure on a regular basis and the length of time that the structure has remained stationary.  <u>Gremillion</u>, 904 F.2d at 293.  "Objective vessel features" such as navigational aids, a raked bow, lifeboats and other lifesaving equipment, bilge pumps, crew quarters, and Coast Guard registration may also be relevant in determining an owner's purpose in constructing or assembling a craft.  <u>Bernard</u>, 741 F.2d at 832 n.25.

The second prong of our inquiry, the business in which the craft is engaged, is usually the most difficult.  Here, evaluating the importance of the craft's transportation function is the key to determining the craft's status.  In all of our work platform cases, the transportation function of the craft at issue was merely incidental to its primary purpose of serving as a work platform.[9]

_____

[9]  Indeed, in the vast majority of these work platform cases, the structure at issue was moored or otherwise fastened in a more or less permanent manner to either the shore or the water bottom.

13

Conversely, where the use of the craft in transporting passengers, cargo, or equipment was an important part of the business in which the craft was engaged, we have found that craft to be a vessel, even if it also served as a work platform. For example, our drilling rig cases recognize the premise that a vessel can serve the dual function of transporting cargo, equipment, or persons across navigable waters and acting as a work platform. Colomb, 736 F.2d at 220-21; see also Brunet, 715 F.2d at 198-99 (crane barge was designed both to support crane and to transport it on fairly regular basis from jobsite to jobsite). These drilling rigs and other special purpose craft do more than merely float on navigable waters and serve as work platforms. Instead, an important part of their function includes transporting passengers, cargo, or equipment across navigable waters.

### III.

### A.

We turn now to apply these conclusions to the summary judgment evidence produced in this case to determine whether the district court correctly ruled that Rig 3 was not a vessel as a matter of law. Because we find Rig 3 indistinguishable from special purpose craft such as submersible drilling barges and jack-up rigs that this Court has previously found to be vessels, we conclude that the district court erred in finding that Rig 3 was not a vessel as a matter of law. See, e.g., Colomb, 736 F.2d at 220 (submersible drilling barge); Vickers v. Chiles Drilling Co., 822 F.2d 535 (5th

---

See, e.g., Burchett, 48 F.3d at 174; Daniel, 892 F.2d at 405; Watkins, 660 F.2d at 606.

14

Cir. 1987) (jack-up rig). The "purpose for which the craft was constructed" is clear. The evidence established that Rig 3 was assembled to transport the workover rig and its attendant equipment from place to place across navigable waters to service wells located in navigable waters.

As for the "business in which it was engaged," Rig 3 was plugging and abandoning old wells situated at various locations in navigable waters. The transportation function of Rig 3 was not merely incidental. Rig 3's mobility was essential to the work it was designed and built to perform. It was a highly mobile, self-contained unit equipped with most of the equipment found on a drilling rig. The mobility of Rig 3 allowed it to service wells located in various places on navigable waters. Rig 3 did more than merely float or move upon navigable waters: It transported all of the necessary equipment across navigable waters to each location. While Rig 3 did serve as a work platform when stationed over wellheads, this does not detract from the importance of its transportation function. Other special purpose craft such as submersible drilling barges, jack-up rigs, and spud barges remain stationary while performing work, yet retain their vessel status. See, e.g., Ducote, 953 F.2d at 1003-04; Colomb, 736 F.2d at 221. Like the barge in Brunet, Rig 3 was designed *both* to support the workover rig *and* to transport it on a regular basis from one jobsite to another. See Brunet, 715 F.2d at 198-99.

P.A.W. argues that Rig 3 lacks features that objectively suggest that one of its primary purposes was transportation over water. These features include: navigational aids; a raked bow;

15

lifeboats and other lifesaving equipment; bilge pumps; crew quarters; and registration with the Coast Guard as a vessel. Bernard, 741 F.2d at 832 n.25; see also Johnson v. ODECO Oil and Gas Co., 864 F.2d 40, 43 (5th Cir. 1989). We have cautioned however that these factors are not to be "applied mathematically" and are only "useful guides." Gremillion, 904 F.2d at 294 n.9. These factors alone are not determinative of vessel status. See, e.g., Pavone, 52 F.3d at 564 (casino boat with vessel features held not a vessel); Burchett, 48 F.3d at 175-77 (midstream bulk cargo transfer barge with raked bow, anchor lights, lifesaving equipment, and radar held not a vessel); Gremillion, 904 F.2d at 294 (quarterboat having several vessel features held not a vessel). Given the undisputed evidence in this case that P.A.W. assembled Rig 3 with a primary purpose that it be used to transport the workover rig and other necessary equipment from place to place across navigable waters, reliance on the lack of objective "vessel features" is misplaced.

In sum, the summary judgment evidence clearly reveals both "the purpose for which the craft [was] constructed and the business in which it [was] engaged." P.A.W. assembled Rig 3 as a highly mobile unit to plug and abandon wells at various locations in navigable waters. Consistent with this purpose, Rig 3 was engaged in the business of plugging and abandoning these wells located in navigable waters. The summary judgment evidence demonstrated that transporting the necessary equipment from location to location across navigable waters was essential to Rig 3's work. Rig 3 is, therefore, a vessel as a matter of law, and the district court

16

erred in reaching a contrary conclusion.

B.

Because it found that Rig 3 was not a vessel as a matter of law, the district court did not consider whether Manuel satisfied the other requisite for seaman status--a substantial employment-related connection to a vessel in navigation. Chandris, 515 U.S. at 368. Ordinarily, seaman status is a fact-specific inquiry better left to the province of the jury. Ducote, 953 F.2d at 1002; see also Offshore Co. v. Robison, 266 F.2d 769, 779-80 (5th Cir. 1959). However, "[w]hen the underlying facts are established, and the rule of law is undisputed, the issue is whether the facts meet the statutory standard." McDermott Int'l. v. Wilander, 498 U.S. 337, 356, 111 S. Ct 807 (1991).

The summary judgment evidence established that Manuel was assigned to and worked aboard Rig 3 the entire two months he worked for P.A.W. Also, it is undisputed that Manuel's duties contributed to the function of Rig 3. P.A.W.'s argument that Manuel does not have the requisite connection to a vessel is limited to the assertion that the possibility that Manuel could have been assigned to other work locations renders his assignment to Rig 3 less than permanent. This argument is seriously flawed. In Chandris, the Supreme Court makes it clear that the adequacy of the plaintiff's connection to a vessel is properly assessed on the basis of his work assignment at the time of his injury:

> Such a person should not be denied seaman status if injured shortly after the reassignment [to a vessel], just as someone actually transferred to a desk job in the company's office and injured in the hallway should not be entitled to claim seaman status on the basis of prior service at sea.

17

<u>Chandris</u>, 515 U.S. at 372.  At the time of his injury, Manuel was assigned to work aboard a vessel in navigation.  The fact that Manuel was subject to reassignment by P.A.W. at some later time is of no moment.  As the Supreme Court pointed out in <u>Chandris</u>, "[w]hen a maritime worker's basic assignment changes, his seaman status may change as well."  <u>Chandris</u>, 515 U.S. at 372.  Manuel's basic assignment never changed; he remained assigned to Rig 3 for the entire two months leading up to his injury.  Therefore, we conclude that Manuel satisfies <u>Chandris</u>' two-prong test for seaman status as a matter of law.

IV.

For the reasons stated above, we conclude that the district court erred when it concluded that Rig 3 was not a vessel as a matter of law.  Also, the uncontroverted evidence establishes that Manuel had a substantial "employment-related connection" to Rig 3, a vessel in navigation, and was a seaman as a matter of law.  Therefore, we REVERSE the district court's grant of summary judgment to P.A.W. and RENDER judgment, granting Manuel's motion for summary judgment on seaman status.  We REMAND this case for further proceedings consistent with this opinion.

REVERSED, RENDERED, and REMANDED.