United States Court of Appeals
Fifth Circuit

**F I L E D**

**January 19, 2006**

Charles R. Fulbruge III
Clerk

REVISED FEBRUARY 3, 2006
IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

No. 04-30732

ADDIE HOLMES,

Plaintiff-Appellant,

versus

ATLANTIC SOUNDING COMPANY INC;
WEEKS MARINE INC; ABC INSURANCE
CO; XYZ INSURANCE CO,

Defendants-Appellees;

--------------------------------------------------------
Cons. No. 04-30750

ADDIE HOLMES,

Plaintiff-Appellant,

versus

ATLANTIC SOUNDING COMPANY INC;
ABC INSURANCE CO INC,

Defendants-Appellees.

---------------------------
Appeals from the United States District Courts
for the Western District of Louisiana
--------------------

Before WIENER, DEMOSS, and PRADO, Circuit Judges.

WIENER, Circuit Judge:

This court's previous opinion is hereby withdrawn, and the following opinion is substituted:

In this consolidated appeal of two state actions that were removed to different district courts, Plaintiff-Appellant Addie Holmes appeals the denial of her motion to remand and the dismissal of her Jones Act and general maritime law personal injury suit against defendants-appellees, Atlantic Sounding Co., Inc. ("Atlantic"), her nominal payroll employer, and Weeks Marine, Inc. ("Weeks"), for which she was actually performing services at the time in question. The dispositive issue — whether an unpowered floatable structure like Weeks's quarterbarge BT-213 ("the BT-213"), on which Holmes was working when injured, is a vessel for Jones Act purposes — is not one of first impression in this circuit. We resolved this issue in Gremillion v. Gulf Coast Catering Co.,[1] answering the question in the negative; however, the Supreme Court's recent decision in Stewart v. Dutra Construction Co.[2] calls into question the analysis underlying our holding in Gremillion. We therefore must determine what effect, if any, Stewart has on this aspect of our vessel jurisprudence.

For the reasons that follow, we conclude that the BT-213 is a vessel for purposes of the Jones Act. We therefore reverse the district courts' judgments and orders adverse to Holmes and remand

---

[1] 904 F.2d 290 (5th Cir. 1990).

[2] 543 U.S. 481, 125 S. Ct. 1118 (2005).

these cases to those courts for further proceedings consistent with this opinion.

## I. FACTS

Holmes sued defendants-appellees Atlantic and Weeks (collectively, "appellees") in Louisiana state court seeking damages for injuries that she allegedly sustained on her first day of work as a cook aboard the BT-213. Holmes is a Louisiana domiciliary. Both Atlantic and Weeks are New Jersey corporations with their principal place of business in Cranford, New Jersey.

The BT-213 is 140 feet long and 40 feet wide. It is, in effect, a floating dormitory, a barge on the deck of which a two-story, 50-bed "quarters package" is mounted. Weeks causes the BT-213 to be moved from place to place to house and feed employees during dredging projects at various locations. The BT-213 has sleeping quarters on both stories, as well as toilet facilities, a fully-equipped galley, locker rooms, freshwater deck tanks, diesel-powered electrical generators, and a gangway with railings. The BT-213's entire "crew" consists of two cooks and two janitors. There is no record evidence that they are transported on the BT-213 while it is moved from one site to another.

The BT-213 is towed by tugs between project locations. It is sometimes towed by itself and, at times, together with other barges. Weeks temporarily installs battery-operated running lights on the BT-213 when it is to be towed by itself. When the BT-213 is

3

not in use, it is held in a boat slip at Weeks's facility in Houma, Louisiana. At the time of Holmes's accident, the BT-213 was moored in a private boat slip at Holly Beach in Cameron Parish while the crew of Weeks's dredge worked in the Gulf of Mexico. The BT-213 arrived at Holly Beach in August 2002 and had not moved before Holmes's accident the following month.

The BT-213 has never been inspected by or registered with the Coast Guard. It is not intended to transport personnel, equipment, passengers, or cargo, and no evidence in the record reflects that it has ever done so. It is not fitted out with winches, running lights, a radar, a compass, engines, navigational aids, Global Positioning System, lifeboats, or steering equipment such as rudders. It is incapable of self-propulsion; has no captain, engineer, or deckhand; has no bilge pumps or wing tanks; and has never been offshore.

On the other hand, the BT-213 has a raked bow on each end, and "two end tanks where the rakes are . . . for flotation." It has a radio that is used primarily to communicate with the dredge. It is equipped with bits or bollards that are used to tie it to the shore or to other vessels or structures. It is sometimes moored by anchors and is equipped with life rings and portable water pumps.

Holmes alleges that when she attempted to place her belongings in her locker on the BT-213, both the locker and a television set that was on top of it fell on her as she opened the locker door.

She alleges further that the accident caused injuries to her neck, shoulder, ears, and nose and caused dizziness as well.

Holmes sued Atlantic and Weeks in Louisiana state court, asserting claims under the Jones Act[3] and general maritime law. She later filed a second suit in Louisiana state court against Atlantic, seeking maintenance and cure.

These cases were removed to different federal district courts. In their respective removal notices, Atlantic and Weeks advanced that Holmes fraudulently pleaded a Jones Act claim to prevent removal to federal court and that diversity jurisdiction existed under 28 U.S.C. § 1332. Holmes responded with motions to remand both suits. The magistrate judge ordered the parties to brief the issue of Jones Act liability.

After discovery and briefing were complete, the magistrate judge issued reports and recommendations in both suits, proposing that the district courts deny Holmes's motions to remand and enter judgments in favor of Weeks and Atlantic. The magistrate judge concluded that (1) the BT-213 is not a vessel for purposes of the Jones Act, (2) Holmes could not establish any possibility of recovery under the Jones Act, and (3) as diversity jurisdiction existed, removal was proper. Holmes timely objected to the magistrate judge's report and recommendation.

---

[3] 46 U.S.C. App. § 688.

In June 2004, the district court to which Holmes's maintenance and cure suit against Atlantic had been removed adopted the report and recommendation and issued a partial final judgment in favor of Atlantic. After Holmes conceded that no other viable claims remained, the district court amended the partial final judgment to reflect its finality.

One month later, the district court to which Holmes's Jones Act and general maritime law suit against Weeks and Atlantic had been removed adopted the magistrate judge's report and recommendation, denied Holmes's motion to remand, and dismissed her Jones Act claim. The court certified the partial final judgment under Federal Rule of Civil Procedure 54(b). Holmes timely filed notices of appeal in both courts. We consolidated the appeals of these two cases.

## II. ANALYSIS

### A. Standard of Review

We review the denial of a motion to remand de novo.[4]  We also review a district court's grant of summary judgment de novo.[5] Whether an unconventional craft is a vessel is an issue that is generally resolved as a matter of law, although we have recognized that "at the margin, fact issues may be presented."[6]

**B.  Issues**

**1.  Removal**

Generally, Jones Act cases are not removable from state court.[7]  A fraudulently pleaded Jones Act claim does not, however, bar removal.[8]  A defendant may "'pierce the pleadings to show that the Jones Act claim has been fraudulently pleaded to prevent removal.'"[9]  The district court may use a "summary judgment-like procedure" to determine whether a plaintiff has fraudulently pleaded a Jones Act claim.[10]  "The court may deny remand where, but

_____

[4] S.W.S. Erectors, Inc. v. Infax, Inc., 72 F.3d 489, 494 (5th Cir. 1996) (citing Allen v. R & H Oil & Gas Co., 63 F.3d 1326, 1336 (5th Cir. 1995).

[5] Id. at 492 (citing Lee v. Wal-Mart Stores, Inc., 34 F.3d 285, 288 (5th Cir. 1994)).

[6] Manuel v. P.A.W. Drilling & Well Serv., 135 F.3d 344, 347 (5th Cir. 1998) (citing Ducote v. Keeler & Co., Inc., 953 F.2d 1000, 1002 (5th Cir. 1992)).

[7] See Burchett v. Cargill, Inc., 48 F.3d 173, 175 (5th Cir. 1995).

[8] See id.

[9] Id. (quoting Lackey v. Atlantic Richfield Co., 990 F.2d 202, 207 (5th Cir. 1993)).

[10] Id. at 176.

only where, resolving all disputed facts and ambiguities in current substantive law in plaintiff's favor, the court determines that the plaintiff has no possibility of establishing a Jones Act claim on the merits."[11]

To qualify as a seaman under the Jones Act, an employee must first demonstrate that his duties "'contribute to the function of the vessel or to the accomplishment of its mission.'"[12] Second, "a seaman must have a connection to a vessel in navigation (or an identifiable group of vessels) that is substantial in terms of both its duration and its nature."[13] Atlantic and Weeks contend only that the BT-213 is not a vessel under the Jones Act. Accordingly, if Atlantic and Weeks carry their burden and demonstrate that there exists no genuine issue of material fact as to the BT-213's vessel status, removal was proper, as was dismissal. For the following reasons, we find that the BT-213 is a vessel for Jones Act purposes. Accordingly, we vacate the district courts' denials of Holmes's motions to remand, and we remand to those courts for further proceedings not inconsistent with this opinion.

## 2. Our Pre-Stewart "Vessel" Jurisprudence

---

[11] Hufnagel v. Omega Serv. Indus., Inc., 182 F.3d 340, 345–46 (5th Cir. 1999) (citing Burchett, 48 F.3d at 176).

[12] Chandris, Inc. v. Latsis, 515 U.S. 347, 359 (1995) (quoting McDermott Int'l, Inc. v. Wilander, 498 U.S. 337, 355 (1991)).

[13] Id.

8

"The existence of a vessel is a 'fundamental prerequisite to Jones Act jurisdiction' and is at the core of the test for seaman status."[14]  The term "vessel" has, however, escaped precise definition.  The exotic watercraft that have been deemed vessels and the heavy inquiry that surrounds each analysis of an unconventional craft's status has led even this court to recognize that the "three men in a tub would . . . fit within our definition [of a Jones Act seaman], and one probably could make a convincing case for Jonah inside the whale."[15]

Historically, we have noted that the term "vessel" connotes a structure designed or used for "transportation of passengers, cargo or equipment from place to place across navigable waters."[16]  "As a general principle, where the vessel status of an unconventional craft is unsettled, it is necessary to focus upon 'the purpose for which the craft is constructed and the business in which it is engaged.'"[17]  "The greater the structure's resemblance to

---

[14] Daniel v. Ergon, Inc., 892 F.2d 403, 407 (5th Cir. 1990) (quoting Bernard v. Binnings Constr. Co., 741 F.2d 824, 828 (5th Cir. 1984)).

[15] Burks v. Am. River Transp. Co., 679 F.2d 69, 75 (5th Cir. 1982).

[16] Cook v. Belden Concrete Prods., 472 F.2d 999, 1002 (5th Cir. 1973).

[17] Gremillion v. Gulf Coast Catering Co., 904 F.2d 290, 292 (5th Cir. 1990) (quoting Blanchard v. Engine & Gas Compressor Servs., Inc., 575 F.2d 1140, 1142 (5th Cir. 1978)).

conventional seafaring craft, the greater the odds of securing vessel status."[18]

To evaluate the purpose for which a craft is constructed, we have considered: (1) whether the owner assembled or constructed the craft to transport passengers, cargo, or equipment across navigable waters; (2) whether the craft is engaged in that service; (3) whether the owner intended to move the craft on a regular basis; (4) the length of time that the craft has remained stationary; and (5) the existence of other "objective vessel features," such as: (a) navigational aids; (b) lifeboats and other life-saving equipment; (c) a raked bow; (d) bilge pumps; (e) crew quarters; and (f) registration with the Coast Guard as a vessel.[19]

To determine the business in which the craft is engaged, "evaluating the craft's <u>transportation</u> function is the key to determining the craft's status."[20] When the transportation function of the craft is merely incidental to the craft's primary purpose, we have consistently held that the craft is not a vessel.[21] On the other hand, when the transportation function of the craft is "an important part of the business in which the craft was engaged," we have generally found the craft to be a vessel, even if it has also

---

[18] <u>Id.</u>

[19] <u>Manuel</u>, 135 F.3d at 350-51; <u>Gremillion</u>, 904 F.2d at 293.

[20] <u>Manuel</u>, 135 F.3d at 351 (emphasis added).

[21] <u>See</u> <u>id.</u>

served as a work platform.[22]  We have attributed three common

attributes to nonvessels:

> (1) The structure was constructed to be used primarily as
> a work platform;
> (2) the structure is moored or otherwise secured at the
> time of the accident; and
> (3) although the platform is capable of movement, and is
> sometimes moved across navigable waters in the course of
> normal operations, any transportation function is merely
> incidental to the platform's primary purpose.[23]

### 3.  **Stewart**

With this backdrop in mind, we turn to the recent Supreme

Court opinion in Stewart v. Dutra Construction Co.[24] to determine

any possible effect on our vessel jurisprudence.  In Stewart, the

plaintiff sued Dutra Construction Co. ("Dutra") under the Jones Act

and the Longshore Harbors Workers' Compensation Act ("LHWCA") after

he injured himself on Dutra's dredge, the Super Scoop.[25]  The Court

described the Super Scoop as follows:

> The Super Scoop is a massive floating platform from which
> a clamshell bucket is suspended beneath the water.  The
> bucket removes silt from the ocean floor and dumps the
> sediment onto one of the two scows that float alongside
> the dredge.  The Super Scoop has certain characteristics
> common to seagoing vessels, such as a captain and a crew,
> navigational lights, ballast tanks, and a crew dining
> area.  But it lacks others.  Most conspicuously, the
> Super Scoop has only limited means of self-propulsion.

---

[22] See id.

[23] Pavone v. Miss. Riverboat Amusement Corp., 52 F.3d 560, 570 (5th Cir. 1995); Gremillion, 904 F,2d at 294.

[24] 543 U.S. 481, 125 S. Ct. 1118 (2005).

[25] See id. at 1121-22.

It is moved long distances by tugboat. . . . It navigates short distances by manipulating its anchors and cables.[26]

The district court granted summary judgment in favor of Dutra "because the <u>Super Scoop</u>'s primary purpose was dredging rather than transportation and because it was stationary at the time of Stewart's injury."[27]  The district court held, as a matter of law, that (1) the <u>Super Scoop</u> was not a vessel, and (2) Stewart could not establish seaman status.  The court of appeals affirmed.[28]  The Supreme Court granted certiorari and reversed.

The Supreme Court granted certiorari "to resolve confusion over how to determine whether a watercraft is a 'vessel' for purposes of the LHWCA."[29]  The Court stated that 1 U.S.C. § 3 provides the controlling definition of "vessel" for LHWCA purposes:[30] "every description of watercraft or other artificial contrivance used, <u>or capable of being used</u>, as a means of transportation on water."[31]  Although the issue on which the Court granted certiorari would appear at first to limit <u>Stewart</u>'s precedential force to LHWCA cases only, we cannot read <u>Stewart</u> so narrowly.  Indeed, the Court's opinion refers to the Jones Act and

---

[26] <u>Id.</u> at 1121.

[27] <u>Id.</u> at 1122.

[28] <u>Id.</u>

[29] <u>Id.</u> at 1123.

[30] <u>See id.</u> at 1129.

[31] 1 U.S.C. § 3 (emphasis added).

12

the LHWCA interchangeably and nowhere limits § 3's definition of "vessel" to the LHWCA, either expressly or implicitly.

Other language in the opinion supports our conclusion that the Court used Stewart to define "vessel" for purposes of both statutes. After noting that the Jones Act does not define "seaman" and that the LHWCA does not define "vessel," the Court stated:

> The Shipping Act of 1916 defines the term "vessel" for purposes of the Jones Act. See 46 U.S.C. App. § 801. However, the provisions of the Jones Act at issue here, § 688(a), speaks not of "vessels," but of "seamen." In any event, because we have identified a Jones Act "seaman" with reference to the LHWCA's exclusion, see 33 U.S.C. § 902(3)G) ("a master or member of a crew of any vessel"), it is the LHWCA's use of the term "vessel" that matters. And, as we explain, the context surrounding Congress' enactment of the LHWCA suggests that Rev. Stat. § 3, now 1 U.S.C. § 3, provides the controlling definition of the term "vessel" in the LHWCA.[32]

Further, the Court observed that its earlier cases "show[ed] that at the time Congress enacted the Jones Act and the LHWCA in the 1920's, it was settled that § 3 defined the term 'vessel' for purposes of those statutes."[33] The most telling indication that the Court considers Stewart's holding applicable to the Jones Act is found in the following language:

> Applying § 3 brings within the purview of the Jones Act the sorts of watercraft considered vessels at the time Congress passed the Act. By including special-purpose vessels like dredges, § 3 sweeps broadly, but the other prerequisites to qualifying for seaman status under the Jones Act provide some limit, notwithstanding § 3's breadth. A maritime worker seeking Jones Act seaman

---

[32] Stewart, 125 S. Ct. at 1124 n. 1.

[33] Id. at 1125.

status must also prove that his duties contributed to the vessel's function or mission, and that his connection to the vessel was substantial both in nature and duration. Thus, even though the Super Scoop is a "vessel," workers injured aboard the Super Scoop are eligible for seaman status only if they are "master[s] or member[s]" of its crew.[34]

It is clear, then, that Stewart defines "vessel" for purposes of both the Jones Act and the LHWCA. Given Stewart's significant broadening of the set of unconventional watercraft that must be deemed vessels, however, we are convinced that the Court employed the foregoing language to confirm that there still exist limits on a potential plaintiff's seaman status under the Jones Act.

As Stewart's definition of "vessel" applies equally to the Jones Act and the LHWCA, § 3 clearly controls the definition of "vessel" for purposes of both acts. Thus, as long as a water-borne structure is practically capable of being used for transportation on navigable waters, it is a "vessel."[35] As noted, Stewart has significantly enlarged the set of unconventional watercraft that are vessels under the Jones Act and the LHWCA: "Under § 3, a 'vessel' is any watercraft practically capable of maritime transportation, regardless of its primary purpose or state of transit at a particular moment."[36] Consistent with Stewart's

---

[34] Id. at 1127.

[35] See id. at 1129.

[36] Id. (emphasis added).

14

expanded definition of that term, we have no trouble concluding that the BT-213 is a vessel.

In addition to personnel and cargo, e.g., supplies incidental to room and board, the BT-213 is "practically capable" of transporting equipment. As Holmes noted at oral argument and in her appellate briefs, the BT-213 "transports" the attached (but presumably detachable) quarters modules —— the sleeping and eating "equipment" and feeding and housing supplies for members of the crews of Weeks's dredges —— from shore to dredge site and from dredge site to dredge site; and it did so fourteen times between January 14, 2001, and September 12, 2002. Whether the primary purpose of the BT-213 is to transport the housing modules, and the fact that it happened to be moored to the bank at the time of Holmes's accident, are of no moment.

In addition, the BT-213 possesses a number of the objective characteristics of a vessel. As stated above, it has a raked bow and "two end tanks where the rakes are . . . for flotation." The BT-213 is fitted out with vessel-like gear (such as traditional mooring devices, bits or bollards or cleats) for securing it to the shore or to other vessels by lines or hausers. It is generally moored with anchors as well as land lines; and, on some projects, it is moored in navigable waters, completely inaccessible from the shore except by boat. We also note that when the BT-213 is moored near a dredge site, its mooring is temporary only, which distinguishes it to some extent from the quarterbarge in

15

<u>Gremillion</u>, which "was partially sunk into a shoreside mudbank,"[37] and from the faux paddle-wheel gaming boat in <u>Pavone</u>, which was moored to the shore permanently, save only in the event of a hurricane.

Further, although the BT-213 is totally incapable of self-propulsion, and the <u>Super Scoop</u> in <u>Stewart</u> had "limited means of self-propulsion," both were moved long distances by tugs.[38] As we read <u>Stewart</u>, it was not the <u>Super Scoop</u>'s limited means of self-propulsion that rendered it a vessel for purposes of the Jones Act or the LHWCA. We recognize that the BT-213 too lacks many of the objective features of those unconventional watercraft that we have nevertheless held to be vessels, but we accept <u>Stewart</u>'s teaching that the class of water-borne structures that are vessels for LHWCA and Jones Act purposes is broader than we have heretofore held.[39]

As a final caveat, we caution the trial courts henceforth to remain mindful that, even though § 3's definition of vessel sweeps broadly, "the other prerequisites to qualifying for seaman status under the Jones Act provide some limits . . . . A maritime worker seeking Jones Act seaman status must also prove that his duties contributed to the vessel's function or mission, and that his connection to the vessel was substantial both in nature and

---

[37] <u>Gremillion</u>, 904 F.2d at 291.

[38] <u>See</u> 125 S. Ct. at 1121–22.

[39] <u>See</u> <u>id.</u> at 1129.

16

duration."[40]  Thus, we express no opinion as to whether Holmes qualifies for Jones Act seaman status:  We have been called on to determine <u>only</u> whether the BT-213 is a "vessel" under <u>Stewart</u>'s expanded definition of that term, a question that we answer today in the affirmative.

### III. CONCLUSION

When we factor all discrete facts unique to the BT-213 into the framework of our vessel jurisprudence as modified by <u>Stewart</u>, we conclude that the BT-213 is a vessel for Jones Act purposes. Accordingly, we reverse the rulings of the district courts grounded in their determinations of non-vessel status and remand these cases to their respective district courts for proceedings consistent with this opinion.

REVERSED AND REMANDED.

---

[40] <u>Id.</u> at 1127 (citing <u>Chandris</u>, 515 U.S. at 376).