ROLAND L. BELSOME, Judge.
 

 | ¶ Plaintiff-Appellant appeals the trial court’s grant of motion for summary judgment in favor of Defendant-Appellee. We find that Appellant is entitled to a trial on the merits regarding his Jones Act claim and reverse.
 

 FACTS AND PROCEDURAL HISTORY
 

 Plaintiff-Appellant, Jason Navarre, filed suit against Appellee, Kostmayer Construction Company, Inc. (“Kostmayer”), for injuries sustained on December 4, 2007, as a result of the alleged negligent operation of a crane spud barge, ORBR1. Mr. Navarre was employed hourly as a welder by Appellee. Mr. Navarre’s injury, a broken ankle, occurred while he was in a basket suspended from a crane, cutting pilings that were holding the barge in place. At the time of the accident, the barge was in the Mississippi River at Point-a-la-Hache. Appellee filed a Motion for Summary Judgment, arguing that Mr. Navarre was a land-based employee (a longshoreman) and did not satisfy the standards and criteria of a Jones Act seaman.
 

 Mr. Navarre filed suit asserting his Jones Act claim on July 2, 2008. On December 3, 2009, the trial court granted Appellee’s motion for summary judgment. This appeal followed.
 

 IiSTANDARD OF REVIEW
 

 This Court reviews a court’s disposition of a motion for summary judgment
 
 de novo,
 
 applying the same standards as the trial court.
 
 Schroeder v. Board of Sup’rs of Louisiana State University,
 
 591 So.2d 342, 345 (La.1991).
 

 DISCUSSION
 

 Appellant assigns as error the trial court’s grant of Appellee’s motion for summary judgment and the trial court’s finding that Mr. Navarre failed to satisfy the requirements of a Jones Act seaman.
 

 Appellee submits that the trial court was correct, noting that Mr. Navarre would receive a call from a supervisor advising a location of a new job, and would then drive to the job site, perform the welding repair, either on land, docks, or spud barges that were fixed in place. If the barge needed to be moved, a tug would be used to relocate the barge. As the tug moved the barge, Appellee argues, Mr. Navarre and the other workers would exit the barge and travel to the next job site in their own
 
 *923
 
 vehicles. Appellee maintains that Mr. Navarre never ate any meals nor stayed overnight on any vessel, but returned home when his shift was complete at the end of each day. Furthermore, Appellee argues that when Mr. Navarre was aboard the barges, they were used as stationary work platforms for maritime harbor work operations such as driving buoy pilings and dock construction and repair; that the barges were equipped with a crane, had no living quarters and no galley, and that the barge was unmanned.
 

 Appellee concedes, however, that Mr. Navarre was on a moving barge when it was moved short distances at a jobsite. Appellee further concedes that as part of Mr. Navarre’s employment with Kostmayer, he rode in outboard motor boats that were used to transport the crew to and from the shore to the offshore barge.
 

 | ^Appellant argues that, in addition to remaining on the ORBR1 when it was moved at a jobsite and routinely operating the motor boat to the offshore barge, Mr. Navarre regularly “operatfed] the vibratory hammer to drive pilings, as well as the winch which was specifically used to move or reposition the barge short distances at a work site” as well as the barge’s crane occasionally. Furthermore, Appellant submits that Mr. Navarre performed repairs to the hull of the barge itself; spent 60-70% of his work day aboard the barge; and that Mr. Navarre’s duties included tying and untying mooring lines, and spud-ding and unspudding of the barge, which Appellant maintains are traditional deckhand duties.
 

 The well-settled two-part test for determining seaman status is: 1) whether the employee’s duties contributed to the function of the vessel or accomplishment of its mission; and 2) whether that employee had a connection to a vessel in navigation which was substantial both in terms of duration and nature.
 
 Richard v. Mike Hooks, Inc.,
 
 2001-0145, p. 3 (La.10/16/01), 799 So.2d 462, 465 (citing
 
 Chandris, Inc. v. Latsis,
 
 515 U.S. 347, 368, 115 S.Ct. 2172, 132 L.Ed.2d 314 (1995)).
 

 We find that the record evidences that Mr. Navarre’s extensive work on the ORBR1 establishes that the first prong of the
 
 Chandris
 
 test is met;
 
 [1]
 
 accordingly, only the second prong, whether Mr. Navarre’s connection to the ORBR1 was substantial in nature and duration, is at issue. In granting Appellee’s motion for summary judgment, the trial court, in its oral reasons, indicated that it found the fact pattern in
 
 Richard v. Mike Hooks, Inc.
 
 to be analogous to the facts of this case.
 

 |4In
 
 Richard,
 
 the Louisiana Supreme Court found that although the first prong of the
 
 Chandris
 
 test was met, a welder helper’s work in connection with the vessels was “not substantial in nature or duration,” and therefore, the employee was not a seaman under the Jones Act, even though the employee spent in excess of thirty percent of his time on the vessels.
 
 Richard,
 
 2001-0145, p. 6-7, 799 So.2d at 466-468.
 

 In reaching this conclusion, the Supreme Court reversed the Third Circuit’s affirmation of the trial court’s finding that Richard had established that he was a Jones Act seaman. The Third Circuit determined that Richard qualified for seaman status because he spent approximately
 
 *924
 
 thirty percent of his time performing tasks connected to the vessel, and because his employment relationship with Hooks, a dredging company, exposed him to the perils of the sea.
 

 In reversing the appellate court, the Louisiana Supreme Court emphasized that the thirty percent rule
 
 [2]
 
 was simply a guideline and not a “magic number automatically rendering an individual’s connection with a vessel substantial in duration and nature.”
 
 Richard,
 
 2001-0145 at p. 6, 799 So.2d at 466. Specifically, the Court considered the employee’s duties and his connection to the vessel, |ficoncluding that the totality of the circumstances evidenced that Richard could not establish seaman status:
 

 Richard’s time spent aboard Hooks’s vessels and the perils he faced must be considered along with other important facts to determine whether his connection with defendant’s vessels are substantial in nature and duration. In this particular instance, we consider an analysis of the following: all of the vessels on which plaintiff worked were dockside; he was never more than a gangplank’s distance from shore when working on the vessels; some of the vessels were partially on land while being repaired; he never slept on the vessels; he did not eat on the vessels; he did not keep watch on vessels overnight; he was not a member of Hooks’s dredge crew that performed welding on dredges in operation; he never worked on a vessel while it was performing its primary mission; he took his orders from a land-based foreman; he was only aboard small moving vessels once every month, for short durations, where he assisted in moving dredge pipe along a canal adjacent to Hooks’s yard; and his repair duties did not take him to sea. While none of these individual facts alone prohibit an employee from attaining seaman status, a consideration of them together shows that Richard was a land-based employee, not a seaman.
 

 Richard,
 
 2001-0145 at pp. 6-7, 799 So.2d at 466-67 (footnote omitted). With regard to cases cited by the employee in support of his position that he established seaman status, the Court acknowledged that although the cases were arguably factually similar, nevertheless, “the totality of the circumstances [in those cases were] distinguishable.”
 
 Id.
 
 at p. 7, 799 So.2d at 467.
 

 One notable distinction between
 
 Richard
 
 and the instant case is that the plaintiffs Jones Act claim in
 
 Richard
 
 was resolved by trial on the merits, and was not disposed of on a motion for summary judgment.
 
 Bell v. Dunn,
 
 2004-2117, p. 13 (La.App. 4 Cir. 12/21/05), 924 So.2d 224, 234.
 
 *925
 
 The trial court in
 
 Richard
 
 originally denied the defendant’s motion for summary judgment, concluding that a jury could reasonably find that the plaintiff had established seaman status.
 
 Id.
 

 | (¡Furthermore, the record evidences numerous differences between the employee’s connection to the vessel in
 
 Richard
 
 and Mr. Navarre’s work with the ORBR1.
 
 [3]
 
 For example, the employee in
 
 Richard
 
 was assigned to the defendant’s dockside yard,
 
 [4]
 
 whereas Mr. Navarre traveled each day to the particular job site of the barge to which he was assigned.
 
 [5]
 
 Unlike the employee in
 
 Richard,
 
 Mr. Navarre was assigned to the ORBR1 continuously for approximately six months preceding the accident,
 
 [6]
 
 and spent sixty to seventy percent of his time performing work operations aboard the ORBR1.
 
 [7]
 
 “The vessels that Richard worked aboard were dockside,
 
 he was never more than a gangplank’s distance from shore
 
 while working, and some of the vessels being repaired were actually on land.”
 
 Richard,
 
 2001-0145 at p. 2, 799 So.2d at 464 (emphasis added). Conversely, the ORBR1 was not always dockside; sometimes the vessel was only accessible to the crew by outboard motor boat.
 
 [8]
 
 Additionally, as Appel-lee concedes, Mr. Navarre also |7testified that he remained and worked on the ORBR1 while it was being moved on the water during the work day.
 
 [9]
 

 
 *926
 
 Furthermore, the employee in
 
 Richard
 
 “was not hired as part of the dredging crew that performed repairs on vessels during dredging operations.”
 
 Id.
 
 As previously noted herein, Mr. Navarre was assigned continuously to the ORBR1 for approximately six months before the accident, and often performed work on the ORBR1 itself.
 
 [10]
 

 Id.
 
 Additionally, “Richard’s only time spent on a moving vessel was once every month or so when he was required to ride in a small boat to assist in moving dredge pipe along a canal adjacent to Hooks’s yard.”
 
 Richard,
 
 2001-0145 at p. 2, 799 So.2d at 464. Unlike Richard, Mr. Navarre testified in his affidavit that between ten and fifteen times per month, he served as the operator of the barge’s outboard motor boat used to transport the crew to the offshore barge, and that he also operated and used the motor boat as a work platform from which he performed job assignments in areas not accessible by the ORBR1.
 
 [11]
 
 |8 Additionally, as previously noted, Mr. Navarre remained and worked on the barge while it was being moved.
 

 The circumstances surrounding the injury itself also differed greatly. Richard sustained his injuries while he was unloading pipe from a truck on land; in contrast, Mr. Navarre was injured while suspended over the Mississippi River in a work basket that was raised and lowered by the barge’s crane.
 
 [12]
 

 Id.
 
 Finally, the employee
 
 *927
 
 in
 
 Richard
 
 received instructions from a land-based foreman, but Mr. Navarre took all of his orders and assignments from Bruce Busby,
 
 [13]
 
 who testified [ 9that he had been the ORBRl’s superintendent since early 2006.
 
 Richard,
 
 2001-0145 at p. 6, 799 So.2d at 467. Considering the foregoing, under the totality of the circumstances in this particular case, we do not find that the fact pattern in
 
 Richard
 
 is analogous to the instant case.
 

 Not only are the facts of this case distinguishable from those in
 
 Richard,
 

 [14]
 

 but oth
 
 *928
 
 er jurisprudence lends support for the finding that summary judgment as to seaman status was inappropriate in this case. For example,
 
 In Re Endeavor Marine, Inc.,
 
 234 F.3d 287 (5th Cir.2000), acknowledged the
 
 Chandris
 
 Court’s “status-based standard” for determining seaman status, noting that “even a ship repairman (which is traditional longshoreman work and is one of the enumerated | inoccupations under the LHWCA) may qualify for seaman status if he has the requisite employment-related connection to the vessel.”
 
 Id.
 
 at 291 (citing
 
 Chandris,
 
 515 U.S. at 364, 115 S.Ct. at 2172).
 

 Endeavor Marine
 
 involved a crane operator, Kevin Baye, who was struck by a mooring line while working on the vessel FRANK L. At the time of the accident, the FRANK L was on the Mississippi River while a tug boat was pushing it alongside a cargo vessel. The district court, “faced with plaintiff whose primary duties aboard the vessel were in the nature of longshore work,” granted summary judgment in favor of the defendants, “concluding] that Baye’s connection to the FRANK L was not substantial in terms of its nature because his duties did not carry him to sea.”
 
 Endeavor Marine,
 
 234 F.3d at 289. Thus, the district court, relying upon language from
 
 Harbor Tug and Barge Co. v. Papai,
 
 520 U.S. 548, 117 S.Ct. 1535, 137 L.Ed.2d 800,
 
 [15]
 
 erroneously “concluded that because Baye’s duties d[id] not literally carry him to sea, he could ‘not satisfy the second prong of the
 
 Chandris
 
 test.’ ”
 
 Id.
 

 In reversing the district court, the Fifth Circuit held that “when read in context, the ‘going to sea’ passage in
 
 Harbor Tug
 
 is a shorthand way of saying that the employee’s connection to the vessel regularly exposes him ‘to the perils of the sea.’ ”
 
 Id.
 
 at 291 (quoting
 
 Harbor Tug,
 
 520 U.S. at 554-55, 117 S.Ct. at 1540). Thus, the language in
 
 Harbor Tug
 
 did not create a new, specific threshold for seaman status.
 
 [16]
 

 Id.
 
 The Court found that, after considering
 
 *929
 
 the totality of Baye’s | nemployment-relat-ed connection to the FRANK L, Baye was a Jones Act seaman as a matter of law for three reasons: 1) Baye was permanently assigned to the FRANK L, having spent nearly all of the previous eighteen months on the vessel; 2) Baye’s primary job duties were “to operate the cranes on board a vessel whose sole purpose is to load and unload cargo vessels”; and 3) Baye was routinely exposed to the perils of the
 
 sea
 

 [17]
 

 during the course of his employment, as “Baye’s duties d[id] place him on the brown waters of the Mississippi River.”
 
 Endeavor Marine,
 
 234 F.3d at 292, n. 3.
 

 Similarly, the Fifth Circuit rejected the argument that an employee who could have been assigned to other work locations besides the vessel upon which he sustained injury rendered his connection to the vessel insubstantial.
 
 Manuel v. P.A.W. Drilling & Well Service, Inc.,
 
 135 F.3d 344, 352 (5th Cir.1998). The Court noted that the “evidence established that Manuel [the employee] was assigned to and worked aboard Rig 3 the entire two months he worked for P.A.W.” and that it was “undisputed that Manuel’s duties contributed to the function of Rig 3.”
 
 Id.
 
 Therefore, the Court concluded that the employer’s argument that the employee did not have the requisite connection to a vessel based solely on 1 ^allegations that the employee could have been assigned to other work locations was “seriously flawed.”
 
 Id.
 
 Relying in part upon
 
 Chandris,
 
 the Court held:
 

 At the time of his injury, Manuel was assigned to work aboard a vessel in navigation. The fact that Manuel was subject to reassignment by P.A.W. at some later time is of no moment. As the Supreme Court pointed out in
 
 Chandris,
 
 “[w]hen a maritime worker’s basic assignment changes, his seaman status may change as well.”
 
 Chandris,
 
 515 U.S. at 372, 115 S.Ct. at 2191. Manuel’s basic assignment never changed; he remained assigned to Rig 3 for the entire two months leading up to his injury. Therefore, we conclude that Manuel satisfies
 
 Chandris’
 
 two-prong test for seaman status as a matter of law.
 

 Id.
 
 (emphasis added).
 
 [18]
 

 The Louisiana Supreme Court recognized that “[t]he determination of seaman
 
 *930
 
 status is inherently fact intensive, and each case must be decided on the facts presented therein.”
 
 Richard,
 
 2001-0145 at p. 7, 799 So.2d at 467 (citing
 
 Chandris,
 
 515 U.S. at 371, 115 S.Ct. at 2191, and
 
 Wilander,
 
 498 U.S. at 356, 111 S.Ct. at 818).
 
 [19]
 
 “The
 
 Chandris
 
 court poignantly stated that in defining the 1 ^prerequisites for Jones Act coverage, one should focus upon the essence of what it means to be a seaman rather than allowing jurisprudential ‘tests’ to obscure such a finding.”
 
 Wisner v. Professional Divers of New Orleans,
 
 98-1755, p. 5 (La.3/2/99), 731 So.2d 200, 204. Thus, “the total circumstances of an individual’s employment must be weighed to determine whether he had a sufficient relation to the navigation of the vessels and the perils attendant thereon.”
 
 Chandris,
 
 515 U.S. at 370, 115 S.Ct. at 2190 (quoting
 
 Wallace v. Oceaneering Int’l,
 
 727 F.2d 427, 432 (5th Cir.1984)). We find that, considering the totality of the circumstances surrounding Mr. Navarre’s employment, his connection to the ORBR1 was substantial in both duration and nature, and that he is entitled to a trial on the merits of his Jones Act claim. Accordingly, the lower court’s grant of Appellee’s motion for summary judgment is hereby reversed.
 

 CONCLUSION
 

 For the foregoing reasons, the trial court’s judgment is reversed and the matter remanded for proceedings consistent with this opinion.
 

 REVERSED AND REMANDED.
 

 [1]
 

 . Appellee’s brief does not assert that the first prong of the
 
 Chandris
 
 test is not met. The Louisiana Supreme Court has acknowledged that the first prong is extremely broad, and that " ‘all who work at sea in the service of a ship' are eligible for seaman status.”
 
 Richard,
 
 2001-0145 at p. 3, 799 So.2d at 465 (quoting
 
 Chandris,
 
 515 U.S. at 368, 115 S.Ct. at 2190).
 

 [2]
 

 . The
 
 Chandris
 
 Court recognized that the thirty percent rule would not necessarily be applicable in every circumstance:
 

 A maritime worker who spends only a small fraction of his working time on board a vessel is fundamentally land based and therefore not a member of the vessel’s crew, regardless of what his duties are. Naturally, substantiality in this context is determined by reference to the period covered by the Jones Act plaintiff’s maritime employment, rather than by some absolute measure. Generally, the Fifth Circuit seems to have identified an appropriate rule of thumb for the ordinary case: A worker who spends less than about 30 percent of his time in the service of a vessel in navigation should not qualify as a seaman under the Jones Act. This figure of course serves as no more than a guideline established by years of experience, and departure from it will certainly be justified in appropriate cases. As we have said, ”[t]he inquiry into seaman status is of necessity fact specific; it will depend on the nature of the vessel and the employee’s precise relation to it.”
 

 Chandris,
 
 515 U.S. at 371, 115 S.Ct. at 2191 (quoting
 
 McDermott Intern., Inc. v. Wilander,
 
 498 U.S. 337, 356, 111 S.Ct. 807, 818, 112 L.Ed.2d 866 (1991)) (emphasis added).
 

 [3]
 

 . Spud barges are generally considered vessels for purposes of Jones Act claims.
 
 See, e.g., Manuel v. P.A.W. Drilling & Well Service, Inc.,
 
 135 F.3d 344, 347 (5th Cir.1998)(recog-nizing that "we have concluded that special purpose structures such as jack-up rigs, mobile, submersible drilling barges, derrick barges, spud barges, and others are vessels as a matter of law, even though they also served, in part, as work platforms”)(emphasis added)(citing
 
 Mouton v. Tug “Ironworker”,
 
 811 F.2d 946 (5th Cir.1987);
 
 Guidry v. Continental Oil Co.,
 
 640 F.2d 523 (5th Cir.1981); Pro
 
 ducers Drilling Co. v. Gray,
 
 361 F.2d 432 (5th Cir.1966)). However, if a structure is utilized primarily as a work platform only, it is not generally considered to be a vessel.
 
 Manuel,
 
 135 F.3d at 347.
 

 [4]
 

 . "Richard did not work exclusively on any one project, but performed whatever work had to be done in defendant’s yard."
 
 Richard,
 
 p. 1, 799 So.2d at 464.
 

 [6]
 

 . Although Appellee points to testimony in the record that the ORBR1 did not have a regularly assigned crew, Mr. Navarre testified in his affidavit that he had been assigned continuously to the ORBR1 for the six months preceding his accident, and Bruce Busby testified in his deposition that he could not recall exactly, but guessed that Mr. Navarre had worked under his direct supervision on the ORBR1 for approximately three to four months prior to the accident.
 

 [7]
 

 . Mr. Navarre testified in his affidavit that between sixty and seventy percent of his time was spent performing work aboard the barge:
 

 Having reviewed a computer printout of each of my job assignments for Kostmayer between November, 2005 and the date of my accident [December 4, 2007], I have confirmed that more than 60-70% of my time while I was assigned to the Kostmayer barge was spent actually working on and performing work aboard the barge, including repair and maintenance to the barge itself, as opposed to working ashore or on a wharf or pier at the various job sites.
 

 [8]
 

 . See
 
 infra
 
 note 12.
 

 [9]
 

 . Mr. Navarre testified in his deposition that he worked on the vessel while it was moving:
 

 Q. And I think you answered this, but let me make sure. You never actually worked on these barges when they were being moved; you could only work when they were stationary; is that right?
 

 
 *926
 
 A. You can work on them as they move. I mean, if we need to transport somewhere and we were going to get there before the end of the work day, we stayed on them to do whatever we could do until we get there. But if it’s going to be like a two- or three-day transport, no, we didn't stay on them.
 

 [10]
 

 . Mr. Navarre testified in his deposition regarding work that he performed offshore and work that he performed on the vessel itself:
 

 Q. Did you ever perform any repair work to the barge itself?
 

 A. Yes, sir.
 

 Q. What kind of repair work do you recall doing to the crane barge itself?
 

 A. I've gotten into holes and welded, you know, steel patches over holes in the barge. I've jumped in the water one day stuffing shingles in the cracks. You know, cracks of the barge, wooden shingles, so they would seal up and swell the barge, things like just, [sic]
 

 If there's a hole in it, we’ll get in there and see if we can fix it without dry docking, you know.
 

 Q. Is that part of your duties aboard the crane barge?
 

 A. Yes, sir.
 

 [11]
 

 . Mr. Navarre testified in his affidavit regarding his job duties on the barge, which included regular operation of the motor boat:
 

 My job assignments and responsibilities aboard the Kostmayer barge entailed the operation of the barge’s equipment and machinery, including the vibratory hammer used to drive pilings, the winch used to move or reposition the barge short distances as necessary at job sites, the barge’s crane, which I operated on occasion to move tools and equipment around the barge. In addition, I regularly served as the pilot/operator of the small outboard crew boat kept aboard the barge when this vessel was needed to transport the crew to and from the barge's offshore position. This occurred on average about 10-15 times each month. I also operated and used this crew boat as a work platform from which I performed required job assignments in spaces or locations not accessible by the barge.
 

 My duties aboard the barge also included, as necessary, tying and untying the barge lines and spudding and unspudding the barge.
 

 As part of the crew of the barge, I performed regular repairs and maintenance of the barge, including its equipment. I personally repaired and ungraded the pad-eyes securing the crane to the deck of the barge and, on numerous occasions, I repaired leaks in the hull of the barge while the barge was at the job site performing its assigned mission.
 

 [12]
 

 .At the time of Mr. Navarre’s accident, the ORBR1 was offshore, necessitating the use of the aforementioned motor boat that was used to transport the crew back and forth from the
 
 *927
 
 barge to the shore. Bruce Busby testified as follows:
 

 Q. Why don't you go ahead — what did you do after you got [Mr. Navarre] out of the work basket?
 

 A. Then we helped him across the barge, into our work boat, onto the bank and into my truck.
 

 Q. This work boat, can you describe that for me?
 

 A. About 17, 18-foot metal flatboat.
 

 Q. What is that used for?
 

 A. Sometimes getting us back and forth to the banks when we are a little bit too far to reach the banks. Sometimes we use it to work out of. Sometimes we use it just to pull the deck winch cables those short distances that we move the barge.
 

 Q. It has an outboard motor?
 

 A. Yes, sir.
 

 Q. And on this occasion do I gather that for this job the barge was too far out from the shore to just walk onto the barge and you used the work boat to get back and forth to the barge?
 

 A. Yes, sir.
 

 [13]
 

 . Mr. Navarre testified in his deposition:
 

 Q. When Busby was the supervisor on the job, am I right that all of the — yourself, the fitters, laborers, and crane operators took their instructions from Busby?
 

 A. Right.
 

 Mr. Navarre also testified in his affidavit that he took all of his orders from superintendent Bruce Busby:
 

 I took my orders and got my daily job assignments from foreman/superintendent Bruce Busby who was assigned to the same barge as I was and, like I and the rest of the crew, reported to the site where the barge was assigned and located each day.
 

 [14]
 

 . In addition to
 
 Richard, supra,
 
 Appellee cites to Louisiana jurisprudence in support of its argument that workers similarly situated to Appellant were not found to be Jones Act seamen. For example, Appellee argues that in
 
 Bouvier v. Krenz,
 
 702 F.2d 89, 92 (5th Cir.1983);
 
 Romo v. Massman Constr. Co.,
 
 615 F.Supp.2d 488 (E.D.La.2009);
 
 Saienni v. Capital Marine Supply, Inc.,
 
 2005 WL 940558 at *5 (E.D.La.2005)(unpub.); and
 
 Schultz v. Louisiana Dock Co.,
 
 94 F.Supp.2d 746, 750 (E.D.La.2000), stand for the proposition that workers who had stronger connections to vessels than Mr. Navarre were still held not to be Jones Act seamen on summary judgment. We find that Appellee’s reliance on these cases is misplaced for two reasons: (1) the facts of each of these cases are distinguishable from this case; and (2) both the United States Supreme Court and the Louisiana Supreme Court have firmly established that the seaman status inquiry is extremely fact-intensive.
 
 See Chandris, supra; Richard, supra.
 
 In
 
 Bouvier,
 
 the court found that, unlike Mr. Navarre, the plaintiff "might work on as many as ten different ships” in "any given day,” and “would not necessarily complete work on one ship before starting on another,” and did not work “on any specific or identifiable group of vessels.”
 
 Bouvier,
 
 702 F.2d at 91. Therefore, in finding that Bouvier was not a Jones Act seaman, the court concluded that "there simply was no element of permanency or sub-stantiality in Bouvier’s relationship with the vessels.”
 
 Id.
 
 In
 
 Romo,
 
 the plaintiff filed suit pursuant to the Longshoreman and Harbor Workers Compensation Act (LHWCA).
 
 Romo,
 
 615 F.Supp.2d at 490. The court did not engage in any analysis of facts regarding whether Romo was a Jones Act seaman, but summarily found that it was "undisputed that Romo is a covered employee under the Longshoreman and Harbor Workers Compensation Act.”
 
 Id.
 

 Likewise,
 
 Saienni
 
 is factually distinguishable from the facts of the instant case. In finding that the plaintiff had not established seaman status, the court held:
 

 Regardless of whether plaintiff may be able to prove that his temporal connection to the Ingram defendants' vessels passes the 30 percent threshold, the Court finds plaintiff has failed to come forward with any specific facts demonstrating that the nature of his
 
 *928
 
 work was anything other than land-based repair of the Ingram defendants’ vessels. The undisputed facts in this case are (1) at the time of the alleged accidents, plaintiff was employed by the Ingram defendants as a shoreside mechanic operating out of a land-based fleeting facility and mechanic shop; (2) while performing his job duties, plaintiff’s time was split between working at the fleeting facility in Reserve and traveling by car to service vessels at other locations; (3) of the 40 percent of plaintiff’s total work time which was spent at the fleeting facility, half of that time (20 percent overall) was spent in the mechanic’s shop; (4) when plaintiff’s work duties were performed aboard vessels, the vessels were generally moored at a dock, shipyard or other stationary location; (5) while performing his work at off-site locations, when an overnight stay was required, plaintiff would spend his nights at motels and plaintiff could only recall one occasion when he slept on one of the vessels; (6) while aboard the vessels, plaintiff did not serve as a deckhand, pilot or captain because the vessels had their own crews; (7) in plaintiff’s capacity as a shoreside mechanic, plaintiff reported directly to a shore-based port engineer; and (8) plaintiff performed repairs aboard a vessel while it was underway only four times a year.
 

 Saienni, supra,
 
 at *11. Finally, in
 
 Schultz,
 
 unlike Mr. Navarre’s duties, "Plaintiff's duties were limited to inspecting and repairing barges moored at the facility.”
 
 Schultz,
 
 94 F.Supp.2d at 750.
 

 [15]
 

 . “For the substantial connection requirement to serve its purpose, the inquiry into the nature of the employee’s connection to the vessel must concentrate on whether the employee's duties take him to sea.”
 
 Harbor Tug,
 
 520 U.S. at 555, 117 S.Ct. at 1540.
 

 [16]
 

 . Notably, the Court in
 
 Richard
 
 "agree[ed with the
 
 Endeavor Marine
 
 Court] that the
 
 Harbor Tug
 
 [C]ourt did not intend to make a hard and fast rule that those individuals who do not ‘go to sea’ can never be classified as seamen.”
 
 Richard,
 
 2001-0145 at p. 7, 799 So.2d at 467, n. 2.
 

 [17]
 

 . One author noted that "[i]n its post
 
 -[McDermott Intern., Inc.
 
 v.]
 
 Wilander
 
 seaman status cases, the Court has consistently used the phrase 'perils of the sea’ as a term of art to embrace both perils of the open ocean and vessel-movement dangers.” David W. Robertson,
 
 The Supreme Court's Approach to Determining Seaman Status: Discerning the Law Amid Loose Language and Catchphrases,
 
 34 J. Mar. L. & Com. 547, 570 (2003). In support, the author referenced the following:
 

 Papai,
 
 520 U.S. at 558, 117 S.Ct. 1535, 137 L.Ed.2d 800, 1997 AMC at 1824-25 (referring to the work of a deckhand on a harbor craft as "seagoing activity” and stating that such work subjects the worker to the "perils of the sea”);
 
 Chandris,
 
 515 U.S. at 368, 115 S.Ct. 2172, 132 L.Ed.2d 314, 1995 AMC at 1856 (associating "perils of the sea” with employment on "a vessel in navigation”);
 
 id.
 
 at 380, 515 U.S. 347, 115 S.Ct. 2172, 132 L.Ed.2d 314, 1995 AMC at 1866 (Stevens, J., dissenting, stating that "workers who labor on ships close to shore may face sufficient exposure to the perils of the sea to merit seaman status”);
 
 id.
 
 at 383, 515 U.S. 347, 115 S.Ct. 2172, 132 L.Ed.2d 314, 1995 AMC at 1868 (Stevens, J., dissenting, distinguishing between "perils of the sea” and "risks faced by maritime workers when a ship is moored to a dock”). Cf.
 
 In re Endeavor Marine Inc.,
 
 234 F.3d 287, 291-292 & n. 3, 2001 AMC 581, 586 & n. 3 (5th Cir.2000) (holding that "perils of the sea" includes vessel-movement dangers "on the brown waters of the Mississippi River”).
 

 Id.
 
 at n. 150.
 

 [18]
 

 . In
 
 Manuel,
 
 the vessel, Rig 3, was a "portable truck-mounted workover rig owned owned by P.A.W. that was driven onto the deck of a leased barge and bolted into place.”
 
 Manuel,
 
 135 F.3d at 346. “[T]he workover
 
 *930
 
 rig had been bolted to this particular barge for more than two years,” and the "flat-deck barge was equipped with spuds used to secure the barge to the water bottom once it reached the worksite.”
 
 Id.
 
 The Rig 3 had no power motor, and was thus maneuvered by tug boat to and from each location; and the barge "did not contain any steering mechanisms, navigational devices, bilge pumps, or crew quarters, except for a small shed in which the crew changed clothes.”
 
 Id.
 
 The Rig 3, used primarily by P.A.W. to plug and abandon wells, contained "a derrick with traveling block, a drawworks-type winch to run the traveling block up and down the derrick, a driller’s console, a mud pump and mud tank, a cement unit for pumping cement into wells, and a crane.”
 
 Id.
 
 The crew of the Rig 3 was described as follows:
 

 Rig 3’s crew consisted of four men: a tool-pusher, a driller, and two floorhands. The crew did not live aboard Rig 3. Each morning, a small boat picked up the crew at a dock and transported them to wherever Rig 3 was located. Upon arriving on Rig 3, the crew would raise the derrick and anchor the barge by dropping the spuds. Each evening, the transport boat would return the men to land, where they slept in lodgings provided by P.A.W. The crew usually did not remain on Rig 3 while it was under tow to a different location.
 

 Id.
 

 [19]
 

 . Due to the hazardous nature of the work encountered by seamen, poor living conditions, "and their constant exposure to the perils of the sea, seamen have traditionally been considered as the 'wards of admiralty,’ and as such have been afforded special protection and consideration by the courts.” Jeffery J. Waltz,
 
 Richard v. Mike Hooks, Inc.: Perils of the Sea: The Supreme Court of Louisiana Ends the Perilous Uncertainty of Jones Act Interpretation in State Court,
 
 48 Loy. L.Rev. 211, 215 (2002)(citing
 
 Harden v. Gordon,
 
 11 F.Cas. 480 (C.C.D.Me.1823)) (No. 6,047). Thus, courts must be vigilant in protecting the rights of seamen:
 

 Every court should watch with jealousy an encroachment upon the rights of seamen, because they are unprotected and need counsel; because they are thoughtless and require indulgence; because they are credulous and complying; and are easily overreached. But courts of maritime law have been in the constant habit of extending towards them a peculiar, protecting favor and guardianship. They are emphatically the wards of the admiralty ...
 

 Id.
 
 at n. 32.